IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Asheville Division)

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **BUEL, INC.,** | ) | Case No. 14-10026 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| **CNTS LEASING, LLC,** | ) | Case No. 14-10027 |
| | ) | |
| Debtor. | ) | |

**DEBTORS' MOTION FOR (I) APPROVAL OF THE SALE OF CERTAIN ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES PURSUANT
TO 11 U.S.C. §§ 105 AND 363; (II) APPROVAL OF CERTAIN WIND-DOWN
PROCEDURES; AND (III) RELATED RELIEF**

NOW COME Buel, Inc. ("Buel") and CNTS Leasing, LLC ("CNTS") (when applicable, Buel and CNTS are referred to jointly as the "Debtors"), debtors and debtors in possession herein, and hereby move the Court for entry of an order: (1) authorizing a direct, private sale of certain of the Debtors' assets free and clear of all liens, claims, encumbrances, and interests according to the terms and conditions of the asset purchase agreement attached hereto as **Exhibit A** (the "APA");[1] (2) approving certain wind-down procedures for the cessation of the Debtors' business in conjunction with said sale; and (3) granting related relief. In support of this Motion, the Debtors respectfully show the Court as follows:

**I. JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief requested

---

[1] Capitalized terms used but not defined in this Motion shall have the meanings assigned to such terms in the APA.

herein are sections 105(a), 363(b), 363(f) and 363(m) of the United States Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

2.     The Court has authority to hear this matter pursuant to the General Order of Reference entered by the United States District Court for the Western District of North Carolina.

## II. BACKGROUND

### A.     General Background Information

3.     Formed in 1986, Buel is a closely-held corporation that is a licensed dry and refrigerated truckload carrier. Buel's fleet of satellite equipped trucks and trailers provide over-the-road transportation services throughout the continental United States.

4.     Organized in 2007, CNTS is a member-managed limited liability company that owns and leases approximately 95 over-the-road tractors to Buel.

5.     On January 17, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court. The Debtors continue in possession of their properties and the management of their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' Chapter 11 cases.

### B.     Assets of the Debtors

6.     The assets of the Debtors to be included in the proposed sale consist of tractors and trailers as listed on Schedule 2.1(a) of the APA; as well as books, records, warranties and files relating to the vehicles and certain personnel records as described in Section 2.1(b) of the APA (collectively, the "Purchased Assets"). Other assets of the Debtors, including but not limited to, real estate, insurance, accounts receivable and cash on deposit as set forth in Section 2.2 of the APA are *not* included in the proposed sale.

## C.    *Secured Claims and Other Liabilities of the Debtors*

7.    Wells Fargo Equipment Finance ("Wells Fargo"), General Electric Capital Corporation, Signature Financial, LLC, Webster Capital Finance, Inc., Branch Banking and Trust Company, and SunTrust Bank ("SunTrust") are Buel's senior secured lenders, with liens upon the company's assets.  Upon information and belief, Buel's obligations to these creditors totaled approximately $4 million as of the Petition Date.  Buel also scheduled priority claims of $34,641.00 and general unsecured claims of approximately $1.3 million.

8.    CNTS's senior secured lenders are Caterpillar Financial Services Corporation ("Caterpillar") and Paccar Financial Corp., with liens upon the company's tractors.  Upon information and belief, CNTS's obligations to these creditors totaled approximately $1.3 million on the Petition Date.  CNTS scheduled no unsecured claims, but serves as a guarantor for most, if not all, Buel's secured obligations and may incur liability for any unsecured deficiency claims asserted by its secured creditors.

## D.    *Filing of Sale Plan by the Debtors*

9.    The Debtors filed a joint plan of reorganization on May 16, 2014, which contemplated a sale of their tractors, trailers, and related equipment by auction pursuant to certain bidding procedures.  The Debtors then entered into an asset purchase agreement with DTL Transportation, Inc. ("DTL") to serve as a stalking horse buyer at an initial purchase price of $2,803,374.64.  Following an extensive marketing effort pursuant to procedures approved by the Court (involving the delivery of detailed solicitation packages to approximately 115 long-haul trucking companies, suppliers, brokers, and other industry participants), no overbids were received for the Debtors' assets.  However, the Court ultimately determined that the proposed

3

sale to DTL did not satisfy section 363(f) of the Bankruptcy Code and the transaction was not approved.

### E. Formulation of Wind-Down Plan and Subsequent Purchase Proposal

10. Thereafter, the Debtors began negotiating an orderly wind-down of their business operations with their secured creditors, certain of which saw benefit in a cooperative effort to collect and dispose of the lenders' collateral. Contemporaneously, Freymiller, Inc., a refrigerated truckload carrier and tractor/trailer dealer based in Oklahoma City, Oklahoma, approached the Debtors regarding a potential acquisition of the Purchased Assets.

### III. PROPOSED SALE AND RELATED WIND-DOWN PROCEDURES

11. Working cooperatively with Freymiller, Inc. and/or its affiliated company, Heartland Leasing, LLC (jointly, the "Purchasers"), and certain of the estates' secured creditors, the Debtors have developed a wind-down plan calling for: (a) the gradual cessation of the Debtors' business, delivery of many of their trucks, trailers, and related assets to the Purchasers' Facility in Oklahoma in contemplation of the sale embodied in the APA, and the orderly collection of the Debtors' accounts receivable (collectively, the "Wind-Down Procedures"); and (b) the implementation of procedures for the determination of a final purchase price for each of the Purchased Assets and the sale thereof to the Purchasers pursuant to the APA (the "Sale Process").

### A. The Proposed Wind-Down Procedures

12. The proposed Wind-Down Procedures to be implemented in conjunction with the Sale Process are as follows:

> (a) The Debtors will cease accepting loads for transport from contract customers during the weeks of January 5 and January 12, 2015 (each a "Final Load");

(b) With respect to the Vehicles securing the claims of Caterpillar, Wells Fargo, and any other consenting creditors, as Final Loads are delivered the Debtors will request that the drivers of such Vehicles deliver the same to the Purchasers' Facility for Physical Inspection, where they will be stored for a period of up to thirty (30) days consistent with the terms of the APA. With respect to all other Vehicles, the drivers may drop the same at such location(s) as is/are reasonably convenient in their discretion;

(c) With respect to each tractor or trailer securing their claims that is delivered to the Purchasers' Facility (each a "Unit"), Caterpillar, Wells Fargo, or any other participating secured creditor, as applicable, shall pay $2,000.00 per Unit to the Debtors within two (2) Business Days of written notification via electronic mail to counsel for the applicable creditor that such Unit has arrived at the Purchasers' Facility. All such payments shall be made to the trust account of the Debtors' counsel, Moon Wright & Houston, PLLC, pursuant to wiring instructions confirmed by the Bankruptcy Court;

(d) During the period from January 5, 2015 through January 31, 2015 (the "Wind-Down Period"), The Finley Group ("TFG"), as representative of SunTrust, may direct and supervise the collection of accounts receivable by Buel, Inc. TFG may exercise such direction and supervision in person at the headquarters of Buel, Inc. as it deems appropriate, provided that the same shall not interfere with the operations of the Debtors during the Wind-Down Period;

(e) In addition to any approved cash collateral budgets pursuant to the *Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection to SunTrust Bank Pursuant to 11 U.S.C. §§ 361 and 363* [Doc. 110], SunTrust will fund and additional $150,000.00 in wind-down expenses, which shall be paid to the trust account of the Debtors' counsel, Moon Wright & Houston, PLLC, by January 15, 2015 pursuant to wiring instructions confirmed by the Bankruptcy Court;

(f) Any and all expenditures paid by the Debtors during the Wind-Down Period shall be approved in advance by the Debtors' Court-appointed financial consultant, W. Andrew Barbee of GreerWalker, LLP, and the Debtors' counsel; and

(g) The Debtors shall cease all business operations, excepting those operations incident to Vehicle Closings, on or before the conclusion of the Wind-Down Period on January 31, 2015.

5

## B. *The Proposed Sale Process*

13.     Pursuant to the APA, the Purchasers generally propose to acquire the Purchased Assets on the following terms and conditions:

(a)     The Purchasers will acquire the Purchased Assets free and clear of all liens, claims, encumbrances and interests for the maximum amount of $2,995,000.00 as allocated in Schedule 2.1(a) of the APA;

(b)     The Purchasers reserve the right to physically inspect each Vehicle delivered to the Purchasers' Facility and, to the extent that such Vehicle's condition is inconsistent with its description as set forth in Schedule 2.1(a) of the APA, to offer a modified purchase price as set forth in Section 2.4(c)(ii) of the APA. Such modified purchase price may be accepted, rejected or countered by the affected secured creditor;

(c)     To extent that a Vehicle is deemed abandoned pursuant to Section 5.5 of the APA, the Purchasers may choose to send a representative, at the Purchasers' cost, to the presumed location of such Abandoned Vehicle in order to physically inspect the same and determine whether to confirm its purchase at the allocated price set forth in Schedule 2.1(a) of the APA or to offer a modified purchase price as set forth in Section 2.4(c)(iii) of the APA. Such offer may be accepted, rejected or countered by the affected secured creditor. The Purchasers are not obligated to inspect any Vehicle if such Vehicle is not delivered to the Purchasers' Facility;

(d)     The Purchasers will acquire all Non-Vehicle Assets at a General Closing to be conducted following entry of the Sale Order pursuant to Section 2.4(b) of the APA. Thereafter, the Purchasers will acquire Vehicles at subsequent Vehicle Closings as described in Section 2.4(c)(ii) of the APA;

(e)     The Purchasers may engage drivers currently employed by the Debtors (as employees or contractors) on the terms and conditions set forth in Section 5.3 of the APA; and

(f)     The Purchasers will not assume any liabilities of the Debtors or their estates.

14.     The Debtors and the Purchasers executed the APA, subject to approval by the Court, on December 31, 2014. A true and accurate copy of the APA is attached hereto as **Exhibit A**.

15.     The Debtors believe that approval of the Sale Process as embodied in the APA, together with implementation of the Wind-Down Procedures, offer the best opportunity to maximize the value of their estates for the benefit of creditors.  A private sale is appropriate under the circumstances, given the extensive marketing effort undertaken by the Debtors pursuant to their prior sale proposal to DTL. *See Order Approving Asset Purchase Agreement, Marketing Procedures, and Bid Procedures in Connection With Sale of Assets* [Doc. 261].  That effort yielded no offers superior to that proposed by the Purchasers.  Therefore, the Debtors submit that relief requested herein is in the best interests of all affected parties and should be approved.

## IV. RELIEF REQUESTED

16.     The Debtors hereby request that the Court conduct a hearing on this motion on January 5, 2015 (the "Sale Hearing").  Following the Sale Hearing, the Debtors further request that the Court enter an order (the "Sale Order"): (a) approving the APA; (b) authorizing the sale of the Purchased Assets to the Purchasers according to the terms and procedures set forth in the APA; (c) approving and implementing the Wind-Down Procedures; and (d) granting such other relief as is just and reasonable.

17.     The Debtors submit that the Sale Order should contain the following findings and determinations, among others, with respect to the proposed sale:

(a)     That the Purchased Assets constitute property of the Debtors' bankruptcy estates, and that title thereto is currently vested in the Debtors' estates within the meaning of 11 U.S.C. § 541(a);

(b)     That the Debtors shall transfer the Purchased Assets to the Purchasers pursuant to Sections 363(b) and (f) of the Bankruptcy Code;

(c)     That the Purchasers shall have and acquire at the closing(s) good, valid and marketable title to the Purchased Assets and the Purchased Assets shall be sold and conveyed to the Purchasers free and clear of any and all

7

liens, claims, encumbrances and interests pursuant to Section 363(f) of the Bankruptcy Code;

(d)    That the Purchasers and the Debtors engaged in arms-length negotiation of the APA, without fraud or collusion, and that the Purchasers shall be found to be "good faith" purchasers within the meaning of Section 363(m) of the Bankruptcy Code;

(e)    That neither the Debtors nor the Purchasers have engaged in any conduct that would cause or permit the sale of the Purchased Assets or any of the documents related thereto to be avoided under 11 U.S.C. § 363(n);

(f)    That the consideration provided by the Purchasers for the Purchased Assets (a) is fair and reasonable, (b) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (c) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia;

(g)    That consummation of the APA and the Wind-Down Procedures are in the best interests of the Debtors, their estates and creditors;

(h)    That the Purchasers shall not assume any liability of the Debtors, and shall not be subject to any claim based on successor liability, alter ego, veil piercing, or similar theory by reason of the acquisition of the Purchased Assets;

(i)    That the Purchased Assets have been adequately marketed and, under the circumstances, a private sale to Purchasers is appropriate and in the best interest of the Debtors, their estates and creditors;

(j)    That adequate notice of the Motion and reasonable opportunity for parties in interest to object to the Motion have been provided under the circumstances; and

(k)    That the Court shall waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Bankruptcy Rule 6004(h).

## V. ARGUMENT

18.    The Debtors believe that the proposed sale to the Purchasers provides the Debtors with the best opportunity to preserve and maximize the value of their estates as a whole. Therefore, implementation of both the Sale Process and the Wind-Down Procedures is in the best

interests of all interested parties. Finally, approval of this Motion is consistent with applicable law and should be granted.

**A.**     ***Section 363(b) of the Bankruptcy Code Authorizes the Proposed Sale***

   ***1. The Proposed Sale is Based Upon the Sound Business Judgment of the Debtors***

19.     Section 363(b)(1) of the Bankruptcy Code provides in pertinent part that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy Rule 6004(f)(1) provides that all sales not in the ordinary course of business may be by private sale or public auction.  A sale of the debtor's assets should be authorized pursuant to Section 363 if a sound business reason exists for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)).

20.     The Debtors have stated sound business reasons for the sale of the Purchased Assets in this case.  Due to the lack of outside funding, the Debtors' inability to continue operating as going concerns in the long term will result in an inability to effectively reorganize.

21.     If their cases were converted to Chapter 7 proceedings, the Debtors anticipate that secured creditors would seek and obtain relief from stay in order to foreclose on their collateral, which would both increase the costs to such creditors and dramatically decrease the value of the Purchased Assets.

22.     Further, even if secured creditors agreed to allow a Chapter 7 Trustee to sell their collateral, conversion of the case would likely lead to depressed values associated with a forced liquidation.  In such circumstances, it is unlikely there would be sufficient funds to satisfy secured debts in full, or to make any distributions to unsecured creditors in these cases.

23.     On the other hand, the proposed Sale Process is expected to yield sufficient funds to satisfy the allowed secured claims of those creditors that choose to participate, while

9

providing for the surrender of non-participating creditors' collateral. Additionally, the Sale Process will produce other monies for the payment of administrative and priority claims of the estate. Further, a sale of the Purchased Assets as contemplated in the APA will allow many of the Debtors' current drivers the opportunity to remain employed by the Purchasers, either as employees or independent contractors, rather than suddenly losing their valued jobs.

24.     Based on the foregoing, the Debtors submit that the Sale Process and Wind-Down Procedures offer substantially greater benefit than a forced liquidation and constitute the best means to maximize the value of the Debtors' estates.

2.     ***Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims***

25.     The Debtors request that the sale and transfer of the Purchased Assets be approved free and clear of all liens. Such relief is consistent with the provisions of § 363(f) of the Bankruptcy Code.

26.     Section 363(f) provides that a debtor in possession may sell property free and clear of any lien, claim or interest of another entity in such property if any of the following circumstances exist:

(1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

27.     As indicated by the use of the disjunctive term "or," satisfaction of any one of the five requirements listed in § 363(f) is sufficient to permit the sale of assets free and clear of liens.

10

*See In re Elliott*, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that Section 363(f) is written in the disjunctive; the court may approve a sale "free and clear" provided that at least one of the subsections is met).

28.     In this instance, the Debtors are informed that the secured creditors asserting security interests in the Purchased Assets consent to the sale thereof to the Purchasers.

29.     Accordingly, the requirements of § 363(f) of the Bankruptcy Code can be satisfied, and the sale of the Assets free and clear of all liens is appropriate.

### 3.     *The Purchasers Should Be Afforded the Protections of Section 363(m)*

30.     Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . ." 11 U.S.C. § 363(m).

31.     As discussed above, the proposed Sale Process has been negotiated in good faith among the various constituencies in these cases following a lengthy and far-reaching marketing process. Accordingly, the Debtors submit that the Purchasers have acted in good faith and are entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code. *See, e.g., In re United Press Int'l, Inc.*, 1992 U.S. Bankr. LEXIS 842, at *3 (Bankr. S.D.N.Y. May 18, 1992).

### B.     *The Court Should Approve the Wind-Down Procedures Because They are in the Best Interests of the Debtors' Estates and Their Creditors*

32.     In addition to the Sale Process embodied in the APA, the Court should approve the proposed Wind-Down Procedures in order to maximize the value of the Debtors' estates. As has been noted previously in these cases, an immediate and unorganized cessation of the

11

Debtors' business will necessarily result in chaos that will adversely affect all of the interested parties (not just those directly involved in the Sale Process itself).

33.    The Debtors' roughly 200 tractors and trailers are spread across the United States each day while transporting goods coast to coast. If their operations were to terminate suddenly (as would be the case in the event of conversion to Chapter 7 or if wholesale stay relief were granted to secured creditors), the Purchased Assets would be abandoned piecemeal in at least 27 different states. The assets would be difficult to recover in such circumstances, dramatically increasing costs to the estates and their creditors.

34.    Such an event would also result in an immediate and substantial depreciation in the value of estate assets excluded from the proposed sale, such as accounts receivable. Undelivered goods would lead to a multiplicity of disputes with customers, insurance claims arising from spoiled or damaged goods, and charge-backs against receivables when shippers are forced to find alternative means to transport loads otherwise contracted by the Debtors.

35.    Therefore, it is imperative that the Wind-Down Procedures be implemented in conjunction with the Sale Process, in order to ensure a gradual, efficient closure of the Debtors' operations. The orderly process proposed by the Debtors will benefit all of the parties affected by the Sale Process and will assist in yielding the maximum return on all of the estates' assets.

## VI. NOTICE OF MOTION

36.    Notice of this Motion has been given to (a) the Bankruptcy Administrator for the Western District of North Carolina, (b) all parties that have requested notice pursuant to Bankruptcy Rule 2002, and (c) all creditors as shown in the official mailing matrices in these bankruptcy cases.

## VII. CONCLUSION

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court (a) approve the APA, (b) authorize the sale of the Purchased Assets to the Purchasers according to the terms and procedures set forth in the APA, (c) approve and implement the Wind-Down Procedures, and (d) grant such other relief as is just and proper.

Dated: Charlotte, North Carolina
   December 31, 2014

              **MOON WRIGHT & HOUSTON, PLLC**

                */s/ Richard S. Wright*
              Travis W. Moon (NC Bar No. 3067)
              Richard S. Wright (NC Bar No. 24622)
              227 West Trade Street, Suite 1800
              Charlotte, North Carolina 28202
              Telephone: (704) 944-6560
              *Counsel for the Debtors*